The next case for argument this morning is Flanagan v. Office of the Chief Judge. Where is Mr. Lowarchik? You're explaining things beautifully. Pardon? You're explaining things beautifully. Mr. Lowarchik, we expect lawyers to be ready when their cases are called. I apologize, Your Honor. I had a family emergency this morning.  Your Honor, the facts of this case involve egregious circumstances, though the questions involved are not necessarily egregious that this court must address. In particular, the most egregious facts were a murder plot that ended unsuccessfully in 2008, where a supervisor named Phil Eisen failed in his attempt to carry out a murder plot against my client, Kim Flanagan. For purposes of oral argument in the limited amount of time we have, I'd like to focus on one claim, the retaliation claim in the complaint. This question is not necessarily difficult to resolve. It's merely whether there was conduct by the defendants that would have persuaded a reasonable person from pursuing protective conduct in the future. Here, the lower court decided in the negative, and the argument that they put forth was that the hearsay obstacles cannot be overcome, and also the adverse acts in question were not actually adverse, sufficiently harsh. For a variety of reasons, I think that this analysis was incorrect. As far as the hearsay argument is concerned, one of the main obstacles that the court put forth was my client's knowledge that when she entered the building where the attempted murder occurred, she knew that there was going to be, in fact, a murder. She had learned this knowledge from a co-worker, another officer, Officer Anderson, who indicated that she overheard a conversation between Phil Lewisen and another co-worker planning to harm Ms. Flanagan. I think that this can come under the exception of the hearsay rule for a couple of different reasons. First of all, when the conversation was relayed to my client, it was certainly relevant for purposes of her state of mind, and also the conversation between Phil Lewisen and Officer Vaughn was also— I don't understand this line of argument. The question is whether the threat was made at all, right? Okay. And how does the hearsay rule permit the particular kind of evidence that was offered? Well, if the threat was made— The threat was not made in the employer's interest. You're not claiming that that's true. Well, the question is whether or not they took reasonable steps to protect the client. That has nothing to do with the hearsay rule. It does in terms of whether or not the actual threat is admissible for purposes of showing— How does that have anything to do with the hearsay rule? Whether or not the threat was made? No. Whether or not the employer took reasonable steps to prevent one employee from threatening another. What does that have to do with the hearsay rule? I think I probably inaptly just answered the question or didn't understand the question, but the threat—I believe the threat is admissible, and I'm not sure— I know you believe that, but you need to provide legal authority. Right. So you make an argument that that's the reason why it's admissible, and so I'm saying what does it have to do with the hearsay rule? Is it in the text of the federal rules of evidence? No. Is there some decision you're relying on? I'm relying on the rules of evidence that it would be a declaration against a party interest, and I know he wasn't saying it on behalf of the employers, but he was a supervisor and an agent of the employers, of his employers. So under those circumstances, I think then the statement could be imputed and that they would be to the employers and they'd be responsible then for that comment. Is there some decision you're relying on for this contention? For agency—well, the case law would be that employers are strictly reliable for supervisors' conduct in the context of retaliation claims. There's some question as to whether or not the actors at question were supervisors, but I don't think that that could be resolved in the summary judgment stage. I think it was a question of fact, because there were certain acts taken by Mr. Lowison that indicate he was in fact a supervisor, such as directing my client in certain circumstances, and particularly the night of the murder plot. I think, too, that I have a hard time grasping—it seems a strange credulity that the various actions taken against Ms. Flanagan were not sufficiently harsh. I would think a failed murder plot and the threat thereof would be sufficiently harsh to merit the guidelines of a retaliation claim, application letter of a retaliation claim. And there is evidence from statements made by Mr. Lowison regarding the pursuits that she had filed that indicate that there was a motive for harming her because of the pursuit of those protected activities. In one instance, while he was walking by her, he said that there she goes again with a new effing charge, and in another occasion he screamed at her saying—in her presence, rather—saying he was sick of everybody and these fucking lawsuits. Now, I would argue that those two statements taking in context with one another, if viewed in the light, most reasonable light to the non-movement, would argue that he did intend and had the motive to harm her for a protected activity. As far as some of the other activities, there's also—in addition, one of the other adverse conditions is that she was told in the parking lot by Mr. Lowison that he could beat her ass, and that he could hit her and no one would care, which is an inference, I would argue, that the management wouldn't care. And, of course, as I— Management's being the chief judge? I'm sorry, Your Honor, I didn't— Management being the chief judge? No, I would argue just the— Well, who is he? I'm arguing that he is the supervisor and any of the other supervisors that she was in close contact with. But ultimately, the person responsible for this operation is the chief judge, right? Right. So, I think that's what Phil—or what Mr. Lowison was saying, and I think that's an inference that could be made, certainly at the summary judgment stage, where we're supposed to make the inference most favorable to the non-movement. I have a minute left. I'm going to reserve for potential rebuttal. Certainly, counsel. Mr. Fry. May it please the Court, Your Honor? My name is Niall Miller. I'm representing the FLEs. Mr. Fry is no longer with the office, and I believe my appearance has been on file. Could you raise your voice, please? Yes, Your Honor. My name is Niall Miller. I represent the FLEs. Mr. Fry is no longer with the office, and I have my appearance on file. And I've been receiving notice about this case, Judge. This case is about plaintiff's retaliation claim against the Office of Chief Judge. Primarily based on two incidents, one on March 2008 and May 2008. As for the individual capacity claims against Vaughn and Lowison, as stated in footnote 2 of her response to motion for summary judgment, plaintiff opted not to pursue those individual capacity claims. As for the race discrimination claims, plaintiff did not raise any arguments or any facts about her race discrimination claims and abandoned it on appeal. As for the retaliation claim against the Office of Chief Judge, the district court properly granted motion for summary judgment because there was no adverse employment action or any evidence that any incidents were connected to protected activity. Also, there was nothing in the record to create a genuine issue of material fact. Just one thing I wanted to raise, Your Honor, is that in the FLEs reply brief, plaintiff asked for the very first time to add a 1983 claim. Any 1983 claims against the Office of Chief Judge would be barred by the 11th Amendment. Obviously, we never had a chance to address this or raise this argument because plaintiff never filed a complaint for 1983 or asked the court to add it or raise it in the opening brief on the appeal. As for the first incident, Judge, what counsel refers to as a murder plot, that occurred on March 13, 2008. There was absolutely no adverse employment action, Judge. What happened was that plaintiff helped escort a probationer named Bonner to the adult probation department. Everyone was upstairs interviewing Bonner. She was providing information to the Chicago Police Department. Plaintiff, most of the night, she waited by herself downstairs outside of the building. She had enough time to call her friend, Officer Burton, her attorney, the U.S. Marshals, and the FBI. After quite some time, everybody came back downstairs and exited the building. Plaintiff refused to exit out the back door. She walked away, and then she went home. There was no adverse employment action. No one touched her. No one threatened her. And, in fact, most of the night, she was outside downstairs by herself. Also, plaintiff provides no evidence of any causal connection to protected activity. The only protected activity that plaintiff is claiming for this incident is the fact that she filed lawsuits before. It can't be the April 1, 2008 charge because, obviously, this incident occurred before she filed the charge. She provides no evidence that this incident occurred because of her lawsuits, other than Mr. Loizon's general statement about lawsuits sometime after May 14, 2008. But during her deposition, plaintiff admitted that she didn't know who this comment was directed to. She admitted that there were several employees who had filed lawsuits, and that she admitted that Mr. Loizon was making this statement generally to the office. Also, Ms. Flanagan, in June of 2009, entered into a settlement agreement of her lawsuits, and that settlement agreement released all claims related to her lawsuits. Since plaintiff's claiming here that she's being retaliated against because of her lawsuits and this incident occurred before she executed the settlement agreement, this retaliation claim is released. Even if the statements by her co-worker, Cheryl Anderson, is admitted, the appellant cited to Whitaker v. Northern Illinois University, in that case, the plaintiff's foreman said that, quote, he was going to get that effing bitch and that he hated her for filing a charge. And in that case, this court found that there was no adverse employment action. Similarly, in this case, there was no adverse employment action. Just briefly touching on those statements that were excluded properly, there was no abuse of discretion in terms of Cheryl Anderson's statement. The alleged statement by Mr. Loizon and Ms. Vaughn concerned matters outside of the scope of their employment, so they're not admission against party opponent under 801 D2. Also, they do not show the declarant's then state of mind under 803-3. Those 803-3 statements must be contemporaneous with the event being proven. Cheryl Anderson admitted during her deposition that she heard these conversations in 2006 or 2007. A 2006 or 2007 statement has no nexus to an incident that occurred on March 13, 2008. As for the other incident in the parking lot that occurred on May 14, 2008, again, there was no adverse employment action. Plaintiff arrived two hours after her shift started. Mr. Loizon saw that and asked what she was doing. Plaintiff claimed during her deposition that she said, quote, that plaintiff said to Mr. Loizon, quote, you're not talking to me. You need to get away from me. You can't do anything to me. Plaintiff claimed that Loizon allegedly said, quote, I could do whatever I want to you. I could hate you and nobody would give a fuck. Loizon at that point left and plaintiff called the Chicago Police Department. Again, in this incident, no one touched plaintiff. No one took any disciplinary actions against her. Plaintiff argued back and escalated the situation by refusing to talk to Mr. Loizon. There was clearly a personality conflict between Mr. Loizon and plaintiff, but there is no adverse employment actions. And unfulfilled threats resulting in no material harm cannot be adverse employment action for retaliation. Also, there is no evidence of any causal connection. Again, plaintiff provides no evidence that this incident is connected to her lawsuits. And in terms of her April 2008 charge, the only evidence that she provides is one isolated statement by Mr. Loizon about a charge, a new effing charge. But it's well established that straight remarks are insufficient to establish retaliatory intent. Also, since the April 2008 charge relates to her lawsuits, and she's also claiming that this incident occurred because of her lawsuits, and she entered into the settlement agreement later in June 2008, this claim is also released. The Office of Chief Judge also did an internal investigation of Ms. Flanagan's claims. They interviewed plaintiff and multiple sources. They obtained and reviewed the FBI reports and other records. Office of Chief Judge even hired outside counsel to do an investigation, and the outside counsel concluded that the office properly handled and responded to the incident. In the abundance of caution, even though there was no evidence of any wrongdoing, they even removed Mr. Loizon from plaintiff's home confinement unit, and plaintiff admitted during her deposition that she actually had no incidents with Mr. Loizon after May of 2008. In fact, at the time of the deposition in 2013, plaintiff had a pending request to transfer back into Mr. Loizon's unit, the GAIN unit. Therefore, we respectfully ask this court to affirm the district court's decision. Thank you, Ms. Miller. Anything further, Mr. Warcher? Yes. Regarding the murder plot, counsel just said that there was no threats made towards Ms. Flanagan, and that's actually not the case, especially when you're viewing the statements in favor of the non-movement. Mr. Loizon, when my client was approaching the alley, said, do it to her, and one of his supervisors refused to go out in front of Ms. Flanagan outside, and he said, you better go out there, and he didn't want her to leave another alleyway. Given the prior comments regarding the threat that was made, I think that she was within her, I think it's within reason to assume that she thought she was going to be harmed when she came in. Counsel also said, opposing counsel said, there was no evidence of connection between the adverse acts and the legal protected activity, and that's not the case, because not only did he say once, generally speaking, that he attacked fucking lawsuits, he also said it to her while he was walking past her, he said, there she is again, filing another fucking lawsuit. He used the pronoun her, which is definitely an expletive reference to her rather than people generally. I think, as the Bard said, Thank you, counsel. Smiles in Denmark, and it should have been forwarded. Thank you. Case is taken under advisement.